THE SCUDERI GROUP, LLC, Plaintiff

v.

LGD TECHNOLOGY, LLC, and Zheng (David) Lou, Ph.D., Defendants.

C.A. No. 07–30142–MAP.

United States District Court, D. Massachusetts.

Sept. 9, 2008.

Windy Rosebush Catino, Barbara L. Moore, Edwards Angell Palmer & Dodge LLP, Boston, MA, for Plaintiff.

Edward J. Dailey, Courtney M. Quish, Bromberg Sunstein LLP, Boston, MA, for Defendants.

### *MEMORANDUM AND ORDER RE: REPORT AND RECOMMENDATION WITH REGARD TO DEFENDANTS' MOTION TO DISMISS OR TRANSFER* (Dkt. Nos. 13 & 25)

PONSOR, District Judge.

This is an action for misappropriation of trade secrets. Defendants filed a Motion to Dismiss for lack of personal jurisdiction, or for transfer to the Eastern District of

Michigan, which was referred to Chief Magistrate Judge Kenneth P. Neiman for report and recommendation.

On July 21, 2008, Judge Neiman issued his Report and Recommendation, to the effect that Defendants' motion should be denied. The conclusion of the Report and Recommendation admonished the parties at 20 n. 2 that objections to the Report and Recommendation must be filed within ten days. No objection has been filed.

Having reviewed the substance of the Report and Recommendation and finding it meritorious, and noting that there is no objection, the court, upon *de novo* review, hereby ADOPTS the Report and Recommendation (Dkt. No. 25).

Based upon this, the court hereby DENIES Defendants' Motion to Dismiss or Transfer (Dkt. No. 13). This case is hereby referred to Judge Neiman for a pretrial conference pursuant to Rule 16.

It is So Ordered.

*REPORT AND RECOMMENDATION WITH REGARD TO DEFENDANTS' MOTION TO DISMISS OR TRANSFER (Document No. 13)*

NEIMAN, Chief United States Magistrate Judge.

In this five-count action, the Scuderi Group, LLC ("Plaintiff"), an engine development company located in Massachusetts, alleges that LGD Technology, LLC ("LGD") and Dr. Zheng (David) Lou ("Dr. Lou") (together "Defendants"), both located in Michigan, engaged in misappropriation of trade secrets (Count I), breached the parties' confidentiality and non-disclosure agreements (Count II), breached the covenant of good faith and fair dealing (Count III), engaged in misrepresentation and fraud (Count IV), and violated Mass. Gen. L. ch. 93A (Count V). Defendants have moved to dismiss the complaint on personal jurisdiction grounds pursuant to

Fed.R.Civ.P. 12(b)(2). Alternatively, Defendants request that the case be transferred to the Eastern District of Michigan. Defendants' motion to dismiss or transfer has been referred to this court for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B). For the following reasons, the court will recommend that Defendants' motion be denied.

## II. BACKGROUND

Under the typical *prima facie* standard for personal jurisdiction, the court must "take those specific facts affirmatively alleged as true and construe them in a light most congenial to the plaintiff's jurisdictional claim ... [and then] add to the mix facts put forward by the defendants, to the extent that they are uncontradicted." *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 134 (1st Cir.2006). Accordingly, the following background is taken, first, from those facts alleged by Plaintiff and then from those put forward by Defendants.

### A. Facts Alleged by Plaintiff

Plaintiff is a family-owned engine development company operated primarily by members of the Scuderi family with investors based mainly in western Massachusetts. (Scuderi Aff. ¶ 3.) Stephen Scuderi, Plaintiff's Vice President and General Counsel and Dr. Lou's principal contact (hereinafter "Scuderi"), works primarily from Plaintiff's office in West Springfield, Massachusetts, and the bulk of his email and phone communications with Dr. Lou were received in Massachusetts. (*Id.* ¶¶ 1, 4.) LGD, for its part, is a one-person Michigan limited liability company that develops variable valve actuation technologies for improved fuel economy, reduced emissions, and enhanced engine performance. (Lou Dec. ¶ 28.)

Plaintiff's initial contact with Dr. Lou occurred at the April 2006 Society of Automotive Engineers ("SAE") trade show in Detroit when Dr. Lou introduced himself to Plaintiff's representatives, including Scuderi, and suggested that Defendants' technology might assist Plaintiff in the development of its engines. (*Id.* ¶¶ 6–7; Lou Dec. ¶¶ 9–10.) After this meeting, Dr. Lou sent the same email multiple times to Plaintiff's representatives, which included a presentation of LGD's capabilities and stated, "Hope we can work with the Scuderi group on technologies." (Scuderi Aff. ¶¶ 9–11; Lou Dec., Exh. 1.) In response to this initial contact, Scuderi sent information to Dr. Lou regarding Plaintiff's technology needs and inquired whether Dr. Lou thought his business could meet these needs, to which Dr. Lou promptly responded by sending multiple inquiries seeking further information from Plaintiff. (Scuderi Aff. ¶¶ 12–13; Lou Dec. ¶ 13, Exh. 3.)

During these initial emails, Dr. Lou indicated to Scuderi—specifically in an email dated April 14, 2006—that he would "treat things confidential" and was willing to sign a non-disclosure agreement ("NDA"). (Scuderi Aff. ¶ 14; Lou Dec., Exh. 3.) Scuderi avers that he received this email in Massachusetts and relied on Dr. Lou's confidentiality representations in further exploring the relationship with Defendants. (Scuderi Aff. ¶ 14.) Based on what Scuderi has learned since, he now believes that Dr. Lou's representation of confidentiality to have been false. (*Id.*)

Scuderi, for his part, advised Dr. Lou that an NDA would be required for Defendants and Plaintiff to have further discussions about a potential business relationship. (*Id.* ¶ 7.) Accordingly, Dr. Lou sent multiple communications to Scuderi in April and May of 2006 soliciting entry into a non-disclosure agreement. (*Id.* ¶¶ 14, 19–21; Lou Dec., Exh. 3, Exh. 5.) As is standard practice in the industry, the NDA would allow Defendants greater access to confidential information, some of which was maintained by Plaintiff's independent engineering contractor, Southwest Research Institute ("SwRI"), which is located in the United Kingdom. (Scuderi Aff. ¶¶ 8, 31.)

On June 8, 2006, Scuderi provided Dr. Lou with a fourteen-paragraph draft NDA. (*Id.* ¶ 23.) The next day, Dr. Lou sent a revised draft which contained only one edit, as follows, to paragraph fourteen's venue provision:

> 14. ~~This Agreement shall be construed and interpreted and the rights and duties of the parties shall be determined in accordance with the substantive laws of the Commonwealth of Massachusetts. The parties hereby submit to the jurisdiction of the courts of the Commonwealth of Massachusetts, which shall be the exclusive venue for any legal action concerning this Agreement.~~ This Agreement shall be construed under the laws of the State of Massachusetts.

(*Id.* ¶ 24.) Although Plaintiff agreed to this change, it notes that Dr. Lou never expressed any of his purported feelings or thoughts regarding the impropriety of venue in Massachusetts. (*Id.* ¶ 25.) Moreover, Plaintiff points out that the modified paragraph fourteen continued to contain a choice of law provision applying the substantive law of Massachusetts to the NDA. (*Id.* ¶ 26; Lou Dec., Exh. 7.) Ultimately, the NDA was signed by Plaintiff, Defendants and a representative of SwRI. (Lou Dec., Exh. 7.)

During the parties' negotiations, Dr. Lou participated in several "1–800" conference calls with SwRI, all of which were made on a Scuderi Group number and were facilitated by Scuderi who participated from Massachusetts. (Scuderi Aff. ¶¶ 17, 18.) Indeed, virtually all of Dr.

Lou's communications with SwRI were made with the authorization of Scuderi to facilitate the collaboration between Defendants, Plaintiff and SwRI about Plaintiff's engine technologies. (*Id.* ¶¶ 15–16, 33.) Dr. Lou and SwRI also included Scuderi in numerous email communications between them concerning the technical feasibility of Dr. Lou's proposed solution for Plaintiff. (*Id.* ¶¶ 33–35, Exh. 2, 3, 4.)

On December 20, 2006, after a substantial period of no communication between Defendants and Plaintiff/SwRI, Dr. Lou re-initiated contact with Plaintiff via an email to SwRI and a "cc" to Scuderi. (*Id.* at ¶ 35, Exh. 4.) A series of emails and other communications followed. One of Dr. Lou's own emails, dated April 16, 2007, recognizes that the work he was doing with SwRI was on behalf of, and for the benefit of, Plaintiff or, as he put it, "the home team." (*Id.* at ¶ 35, Exh. 6.)

Plaintiff also notes that Dr. Lou initiated and engaged in a number of other communications with representatives of Plaintiff seeking further development of their business relationship, including: sending a development plan to Scuderi on June 13, 2006; engaging in discussions at the 2007 SAE Congress regarding a possible consulting arrangement; sending an April 25, 2007 email discussing a contract for development of a prototype by LGD and payments by Plaintiff; a series of telephone conversations with Plaintiff's licensing contractor, Denis Rader ("Rader") who is located in Connecticut, to discuss a possible consulting and intellectual property agreement; a June 5, 2007 email in which Dr. Lou sent an "LGD–Scuderi IP and Consulting Services Arrangement Proposal" seeking more than $1 million from Plaintiff; and a July 17, 2007 email from Dr. Lou proposing a similar, alternative business arrangement with Plaintiff. (*Id.* ¶ 32, 38–41, 44, Exh. 1, 7, 8, 11.)

Finally, Scuderi avers that at the April 2007 SAE trade show, Dr. Lou "indicated his willingness to travel to provide consulting services to [Plaintiff], without expressing any reservation about exposing himself to the jurisdiction of Massachusetts." (*Id.* ¶ 38.) According to Scuderi, "I assured Dr. Lou that [Plaintiff] would pay for any required travel expenses, but that we anticipated that much of his work with [Plaintiff] could be completed from his location in Michigan, as it had been throughout 2006 and early 2007." (*Id.*) Scuderi also avers that "[o]n several occasions from April 2006 to [November 2007], Dr. Lou advised me that he was traveling out of the country, sometime for extended periods." (*Id.* ¶ 45.)

### B. *Facts Alleged by Defendants*

As indicated, Dr. Lou is LGD's president and sole employee and he resides and works in Michigan. (Lou Dec. ¶ 28.) Defendants assert that neither LGD nor Dr. Lou has ever traveled to on conducted business in Massachusetts in connection with their relationship with Plaintiff. (*Id.*) Defendants also note that Dr. Lou's April 14, 2006 email, in which he stated he would "treat things confidential," merely followed up Plaintiff's request for confidentiality. (Lou Dec., Exh. 3.)

Defendants acknowledge that Dr. Lou exchanged information with SwRI. (*Id.*) Nevertheless, Defendants allege the following: that SwRI is located in the United Kingdom; that SwRI is an independent third-party contracted by Plaintiff; that any exchange of business information by both parties (as well as simple well-wishes and small talk) and contemplation of a second meeting in Michigan occurred between Defendants, in Michigan, and SwRI, in the United Kingdom; that Plaintiff, sitting in Massachusetts, watched these email exchanges in silence; and that, in the ma-

jority of these emails, Plaintiff was either left off the email altogether or simply copied on the conversation. (See generally Reply in Further Support of Defs.' Motion to Dismiss or Transfer at 2 (and corresponding references in Dr. Lou's Declaration).)

Defendants also mention Rader, Plaintiff's licensing contractor, but note that he is located in Connecticut. (*Id.* at 2–3 & n. 2.) According to Defendants, Dr. Lou believed that all correspondence to Denis Rader was directed to Connecticut. (*Id.* at 3 n. 2.)

Finally, Defendants address the communications between Dr. Lou and Scuderi in the spring and summer of 2007. According to Defendants, these communications were sparse and simply related to either discussions between the parties about the possibility of a continued relationship, unrelated to this litigation, or unsuccessful attempts to resolve the instant dispute prior to the filing of Plaintiff's complaint. (See *id.* at 2–3.)

## II. DISCUSSION

The court follows the familiar two-stage personal jurisdiction inquiry: (1) whether Plaintiff has demonstrated that jurisdiction is authorized by the forum's long-arm statute; and, if authorized, (2) whether such jurisdiction comports with the Due Process Clause of the United States Constitution. *See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,* 290 F.3d 42, 52 (1st Cir.2002). In the court's view, Plaintiff survives both parts of the inquiry. The court also believes that the case ought not be transferred to Michigan.

### A. Long–Arm Statute

Defendants first argue that Plaintiff is unable to establish personal jurisdiction under the Massachusetts long-arm statute, Mass. Gen. L. ch. 223A, § 3 (hereinafter "section 3"), specifically, subsections (a) or (c), the only subsections Plaintiff cites.[1] Addressing each subsection in turn, the court, in the end, concludes that personal jurisdiction is available under either provision.

As for subsection (a), Defendants assert that the mere exchange of a handful of emails or telephone calls is not enough for them to have "transacted business" in Massachusetts. Moreover, Defendants continue, the causes of action are not ones "arising out" of such contacts but rather, at most, were contacts with SwRI located in the United Kingdom. In response, Plaintiff asserts that "the overall substance and effect" of the parties' relationship demonstrates that Defendants transacted business in Massachusetts and that their claims arise out of such transaction. The court finds Plaintiff's position more persuasive.

Massachusetts courts construe subsection (a) very broadly. *See, e.g., Tatro v. Manor Care, Inc.,* 416 Mass. 763, 625 N.E.2d 549, 551–52 (1994); *Fairview Mach. & Tool Co. v. Oakbrook Int'l, Inc.,* 56 F.Supp.2d 134, 138 (D.Mass.1999). As the First Circuit has noted, a nonresident "transacts business" in Massachusetts as long as he has engaged in "any purposeful acts ... whether personal, private, or commercial." *Ealing Corp. v. Harrods, Ltd.,* 790 F.2d 978, 982 (1st Cir.1986) (citation

---

1. In relevant part, section 3 provides as follows:

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's

(a) transacting any business in this commonwealth; [or]

. . . .

... (c) causing tortious injury by an act or omission in this commonwealth[.]

Mass. Gen. L. ch. 223A, § 3(a), (c).

omitted). Moreover, the defendant's involvement need not be major, as "just a few acts on [his] part can often suffice to satisfy [subsection (a)]'s threshold for transacting business." *Workgroup Tech. Corp. v. MGM Grand Hotel, LLC*, 246 F.Supp.2d 102, 110 (D. Mass.2003) (citing *Bond Leather Co. v. Q.T. Shoe Mfg. Co.*, 764 F.2d 928, 931 (1st Cir.1985) (mailing four letters and receiving at least one telephone call from Massachusetts plaintiff in course of negotiating a guaranty satisfied transacting business requirement of subsection (a)); *Hahn v. Vermont Law Sch.*, 698 F.2d 48, 50 (1st Cir.1983) (mailing application information and acceptance letter to plaintiff in Massachusetts was sufficient to constitute transacting business under broadly-construed subsection (a)); and *Nova Biomedical Corp. v. Moller*, 629 F.2d 190, 195 (1st Cir.1980) (mailing two letters demanding Massachusetts plaintiff cease and desist from patent infringement constituted transacting business for purposes of long-arm statute)). Indeed, at least two judges in this district have held that "even an isolated, 'one-shot' transaction with little impact on the commerce of the Commonwealth may constitute transacting business." *A–Connoisseur Transp. Corp. v. Celebrity Coach, Inc.*, 742 F.Supp. 39, 42 (D.Mass.1990) (citing *Buckeye Assocs. Ltd. v. Fila Sports, Inc.*, 616 F.Supp. 1484, 1492 (D.Mass.1985)). *But see Lyle Richards Int'l, Ltd. v. Ashworth, Inc.*, 132 F.3d 111, 113 (1st Cir.1997) (suggesting that where the contacts are sparse, they must have been instrumental (not incidental) in the formation of the contract in dispute).

■ In view of such precedent, there can be little question—given the parties' ongoing professional communications with one another concerning an evolving contractual relationship—that Defendants were "transacting business" in Massachusetts. For example, after the initial meet and greet at the industry conference in Michigan—initiated, it should be noted, by Dr. Lou—Defendants reached out multiple times to Plaintiff in Massachusetts to establish a business relationship. During these initial overtures, moreover, Defendants sought further information, including detailed confidences, from Plaintiff's representatives here. Eventually, the parties agreed to enter into an ongoing confidential business relationship, embodied by the NDA, and for more than a year thereafter, Defendants continued to communicate with Plaintiff and its independent contractor, SwRI, in further pursuit of this venture. Indeed, when the communications between the parties slowed, it was Defendants who reached out to Plaintiff again to re-ignite the business collaboration process. And ultimately it was Defendants who sent Plaintiff concrete "business proposals" soliciting a formal financial and business relationship.

Granted, Defendants point out that, at times, Plaintiff (in Massachusetts) might not have been as active a recipient of Dr. Lou's communications as SwRI (in the United Kingdom) or even Denis Rader (in Connecticut). However, Defendants cannot evade the fact that Dr. Lou engaged in, and often initiated, multiple communications with Plaintiff *directly*—as well as *indirectly* through SwRI and/or Rader—as part of the development of an ongoing business and professional relationship. *See also Workgroup Tech. Corp.*, 246 F.Supp.2d at 109–110 (defendant who engaged in multiple telephone calls, faxes, and emails to Massachusetts in order to negotiate contract terms transacted business under subsection (a)); *Little, Brown & Co. v. Bourne*, 493 F.Supp. 544, 546–47 (D.Mass.1980) (defendant's multiple contacts with Massachusetts via phone and mail, sometimes initiated by the plaintiff, were sufficient to demonstrate transacting business since they were part of an ongo-

ing business relationship related to development of a book); *Good Hope Indus., Inc. v. Ryder Scott Co.,* 378 Mass. 1, 389 N.E.2d 76, 79–80 (1979) (finding transaction of business in light of ongoing, year-long relationship where defendant communicated regularly with plaintiff by phone and mail).

It is also clear that Plaintiff's claims in this case are ones "arising from" Defendants' transaction of business in Massachusetts. The First Circuit has expressed "no doubt" that the arising from requirement can be met "when the cause of action is for an alleged breach of contract and the business transacted was instrumental in the formation of the contract." *Hahn,* 698 F.2d at 51. *See also Workgroup Tech. Corp.,* 246 F.Supp.2d at 112 (finding subsection (a) satisfied where the defendant's "contacts with Massachusetts played a material role in the formation and ultimately the consummation of the contract that gave rise to [the plaintiff]'s cause of action"). That is certainly the situation here with regard to Plaintiff's breach of contract claim; the business transacted by Dr. Lou in Massachusetts was instrumental in the formation of the parties' agreements, both the written NDA (which was executed by both parties and SwRI) as well as any verbal contracts the parties may have entered. There can also be no question that the other claims alleged by Plaintiff in the complaint—to wit, that Defendants solicited a confidential business relationship, misrepresented their intention to maintain the confidentiality of Plaintiff's information to gain access to and misappropriate such information, and engaged in unfair and deceptive acts or practices—all arise from Defendants' transacting business in Massachusetts. Accordingly, the court finds, and will so recommend, that Plaintiff has established jurisdiction pursuant to subsection (a) of the Massachusetts long-arm statute.

■ Regarding subsection (c), Defendants assert that because they never acted in Massachusetts, they did not cause tortious injury by an act or omission in the commonwealth. Plaintiff, however, argues that courts interpreting subsection (c) consistently have held that when out-of-state defendants knowingly sent false representations into Massachusetts (with the intent that they be relied on to the detriment of a Massachusetts resident), and those statements are relied upon by a Massachusetts resident, the defendants have "acted" within Massachusetts. Again, the court finds Plaintiff's position more persuasive.

■ For one thing, the court, as noted above with respect to subsection (a), believes that Defendants did act in Massachusetts. Moreover, it is "well established" that Plaintiff's allegations of fraud and misrepresentation are "a sufficient basis for jurisdiction under § 3(c)." *La Vallee v. Parrot–Ice Drink Prods. of Am., Inc.,* 193 F.Supp.2d 296, 300 (D.Mass.2002) (citing *Ealing Corp.,* 790 F.2d at 978). As early as 1972, the First Circuit—construing subsection (c) in a fraudulent misrepresentation case—explained that "[w]here a defendant knowingly sends into a state a false statement, intending that it should there be relied upon to the injury of a resident of that state, he has for jurisdictional purposes, acted within that state." *Murphy v. Erwin–Wasey, Inc.,* 460 F.2d 661, 664 (1st Cir.1972). *Accord Whittaker Corp. v. United Aircraft Corp.,* 482 F.2d 1079, 1084 (1st Cir.1973); *JMTR Enters., LLC v. Duchin,* 42 F.Supp.2d 87, 97 (D.Mass.1999); *Burtner v. Burnham,* 13 Mass.App.Ct. 158, 430 N.E.2d 1233, 1236–37 (1982). In addition, Plaintiff has alleged a cause of action under chapter 93A "and the First Circuit Court of Appeals has 'assume[d], without deciding, that a Chapter 93A violation would constitute a

tortious injury under [subsection (c)].'" *La Vallee*, 193 F.Supp.2d at 300 (quoting *Lyle Richards Int'l Ltd.*, 132 F.3d at 114). At bottom, this court is of the opinion that personal jurisdiction is also available over Defendants pursuant to subsection (c) of the Massachusetts long-arm statute.

## B. *Due Process*

Defendants next argue that Plaintiff is unable to establish that the exercise of personal jurisdiction over them would comport with due process. First, Defendants contend that Plaintiff's claims do not arise out of or relate to Defendants' in-state activities. Second, Defendants argue that they did not purposefully avail themselves of Massachusetts. Third, Defendants assert that it would be extremely harsh to require Dr. Lou and his business to defend themselves in Massachusetts and, hence, that exercising personal jurisdiction over them would be unreasonable. For its part, Plaintiff argues that due process would not be offended by forcing Defendants to defend themselves here. Once again, the court finds Plaintiff's argument more persuasive.

 Due process requires the court to find either that it has "specific jurisdiction" over the defendant or "general jurisdiction." *See generally Harlow v. Children's Hosp.*, 432 F.3d 50, 57 (1st Cir. 2005). Specific jurisdiction exists when a defendant's contacts with the Commonwealth "arise out of" or "relate to" the plaintiff's particular cause of action. *See Sawtelle v. Farrell*, 70 F.3d 1381, 1389 (1st Cir.1995). General jurisdiction may be found when a defendant has "continuous and systematic" contacts with Massachusetts, even though those contacts do not relate to the particular cause of action. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Here,

Plaintiff chooses to assert only that this court has specific jurisdiction. The court agrees.

The First Circuit uses a three-part test for determining whether a court has specific jurisdiction over a defendant:

> *First*, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. *Second*, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. *Third*, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*Sawtelle*, 70 F.3d at 1389 (emphasis added) (citing cases). *See also United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 620–21 (1st Cir.2001). The court will address each part of the test in turn, mindful that "[c]entral to each step ... are the contacts which are attributable to [the] defendant." *Sawtelle*, 70 F.3d at 1389.

### 1. *Relatedness*

With respect to the first prong of the analysis, relatedness, the First Circuit prefers a "proximate cause" test to determine whether a claim arises out of, or relates to, a defendant's contacts in the forum. *Negrón–Torres v. Verizon Communs., Inc.*, 478 F.3d 19, 25 (1st Cir.2007) ("A broad but-for argument is generally insufficient. Because but for events can be very remote, due process demands something like a proximate cause nexus.") (citation, internal quotation marks and court's alteration omitted). Put differently, the court must apply a "flexible, relaxed standard" to determine whether there is a "nexus between the defendant's contacts [with Massachusetts] and the plaintiff's cause of action."

*Fairview Machine & Tool Co.*, 56 F.Supp.2d at 139. *See also Wolverine Proctor & Schwartz, Inc. v. Aeroglide Corp.*, 394 F.Supp.2d 299, 307 (D.Mass. 2005).

■ Here, the court believes the required nexus is satisfied because, as indicated, the contacts Defendants had with Plaintiff in Massachusetts were instrumental in the formation of the confidential business relationship and the execution of the NDA, both of which are at the center of Plaintiff's claims. As described more fully above, all of the claims at issue in this case allegedly arise from (or were caused by) Defendants' extensive contacts with Plaintiff, including their solicitation of a business relationship, pursuit of the NDA whereby Defendants gained access to Plaintiff's confidential information, entry into that NDA with Plaintiff, and additional communications with Plaintiff and its agents in pursuit of a further business relationship, during which time Defendants were provided with extensive confidential information belonging to Plaintiff. *See also Champion Exposition Servs. v. Hi-Tech Elec., LLC*, 273 F.Supp.2d 172, 177–78 (D.Mass.2003) (defendant's pre-contractual visit and the transmission back and forth of a business plan and letter agreement were central in forming the parties' contract and, hence, sufficient to demonstrate relatedness); *Workgroup Tech. Corp.*, 246 F.Supp.2d at 113 (finding relatedness based on defendant's multiple telephone calls, faxes, and emails that were instrumental to the formation of the contract at issue); *Lantor, Inc. v. Nicassio Corp.*, 2007 WL 204015, at *8 (D.R.I. Jan.24, 2007) (holding that the parties' "course of dealing, involving numerous communications between [them], was instrumental in the formation of the contract at issue" and, thus, sufficient to establish relatedness). Accordingly, in this court's estimation, the relatedness prong of the due process inquiry has been satisfied by Plaintiff.

### 2. *Purposeful Availment*

■ As for the second prong of the analysis, Defendants argue that they did not purposefully avail themselves of the benefits and obligations of the Commonwealth's laws because it was not foreseeable that they would be brought into court here. As stated by the First Circuit in *Sawtelle*, 70 F.3d at 1391, "[t]he function of the purposeful availment requirement is to assure that personal jurisdiction is not premised solely upon a defendant's "random, isolated, or fortuitous" contacts with the forum state." To determine purposeful availment, a court must look at whether the defendant's forum activity is voluntary and made it foreseeable that it could be brought to court in the Commonwealth. *See id.*

■ As Plaintiff argues, there is no question that Defendants' contacts with Plaintiff were voluntary. As described, it was Defendants who, after initiating contact with Plaintiff, voluntarily reached out to Plaintiff in Massachusetts in order to (1) establish the parties' working relationship and possible collaboration, (2) execute the NDA, and (3) obtain Plaintiff's confidential information so as to confer about Plaintiff's engine technology. For these very reasons, the court believes, it was foreseeable to Defendants that they could end up in a Massachusetts court. In short, Plaintiff has demonstrated the purposeful availment prong of the due process inquiry.

To be sure, Defendants put great emphasis on the fact that the parties, at the request of Dr. Lou, deleted the reference to Massachusetts as the "exclusive venue" for construing the NDA. However, Defendants never indicated that they felt that the parties' relationship was unrelated to

Massachusetts or suggested an alternative forum for resolving their potential disputes. Moreover, they specifically agreed to apply Massachusetts law.

Further, and perhaps most importantly, Defendants cite no case law holding that the deletion of a particular forum selection clause from a draft document means *a fortiori* that the deleted forum lacks personal jurisdiction over the defendant. *Cf. Wolverine Proctor & Schwartz, Inc.*, 394 F.Supp.2d at 310 (despite the fact that the defendant objected to a forum selection clause, "the parties' selection of Massachusetts as the law governing both [NDA] agreements further reinforces [the defendant]'s 'deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there'") (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 482, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). At most, Defendants cite an unreported decision from the District of Colorado, *EagleDirect Marketing Solutions, Inc. v. Engenus NA LLC*, 2006 WL 2988952 (D.Colo. Oct.18, 2006). There, however, the *plaintiff* rejected a New York forum selection clause and, instead, got the defendant to agree to a Colorado choice of law provision, facts which the court deemed evidenced Colorado as an appropriate forum. *See id.*, at *5. If anything, *EagleDirect Marketing Solutions, Inc.* appears to favor Plaintiff's position in the case at bar. Thus, similar to *EagleDirect Marketing Solutions, Inc.*, the parties' inability here to agree upon a forum selection clause leaves the court to look at their choice of law provision and observe that that provision points solely to Massachusetts and not to any other state.

### 3. *Reasonableness*

■ Finally, Defendants contend, with regard to the third prong of the analysis, that making them defend claims in Massachusetts would be unreasonable in light of the five "Gestalt" factors. *See Sawtelle*, 70 F.3d at 1389. Those factors are: "(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." *Noonan v. Winston Co.*, 135 F.3d 85, 89 n. 2 (1st Cir.1998).

■ As for the first factor—the burden of appearing in this forum—Defendants have not shown "special, unusual, or other constitutionally significant" circumstances. *Nowak v. Tak How Investments, Inc.*, 94 F.3d 708, 718 (1st Cir.1996). While the burdens on Defendants may be significant, they are not particularly unusual. *See also Fairview Mach. & Tool Co.*, 56 F.Supp.2d at 140 (since "staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly," allegations of burden on a defendant are "only meaningful where a party can demonstrate some kind of special or unusual burden"; noting also that travel between the Illinois–Michigan area and Massachusetts was not particularly onerous). If anything, Defendants have demonstrated their ability to travel, even overseas, when necessary as well as to engage in remote electronic communications. *See EagleDirect Marketing Solutions, Inc.*, 2006 WL 2988952, at *7 ("[I]n this age of instant communication, it is only in highly unusual cases that inconvenience to the defendant will rise to a level of constitutional concern.") (citation and internal quotation marks omitted).

As to the second and third Gestalt factors, there is little doubt that Massachusetts has an interest in providing its citizens, here Plaintiff, a forum to litigate claims. *See Cambridge Literary Proper-*

*ties, Ltd. v. W. Goebel Porzellanfabrik G.m.b.H & Co. Kg.*, 295 F.3d 59, 66 (1st Cir.2002). Moreover, it is irrelevant whether any other single forum has more of an interest. *See Nowak*, 94 F.3d at 718. Defendants, it should be noted, must concede that Massachusetts is a convenient forum for Plaintiff.

■ As for the fourth and fifth factors—the administration of justice and the common interest of all sovereigns—the court believes that the most effective resolution of the parties' dispute would occur here in Massachusetts. As the First Circuit has explained, the "judicial system's interest in obtaining the most effacious resolution of the controversy . . . counsels against furcation of the dispute among several different jurisdictions." *Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir.1994). *See also Wolverine Proctor & Schwartz, Inc.*, 394 F.Supp.2d at 311 ("It is well established that [a] State generally has a manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors," and Massachusetts "has an obvious interest in providing a civil forum to litigate alleged encroachments upon the property and trade secrets of [Massachusetts] corporations.") (citation and internal quotation marks omitted). In addition, the court must give some deference to Plaintiff's choice of this forum, which is where Plaintiff operates

and where key witnesses and evidence are located; moreover, the parties agreed to apply Massachusetts' substantive laws. *See Wolverine Proctor & Schwartz, Inc.*, 394 F.Supp.2d at 311. In the end, therefore, the Gestalt factors strongly suggest that Massachusetts is the most reasonable forum for Plaintiff's claims.

## C. *Transfer*

Finally, the court does not agree with Defendants' assertion that, under 28 U.S.C. § 1631, the action should be transferred to the Eastern District of Michigan as a more appropriate venue. Defendants include no elaboration to that assertion, other than the due process concerns addressed above. As indicated, the court, after considering those concerns, nonetheless concluded that personal jurisdiction is proper here in Massachusetts.

## IV. Conclusion

For the reasons stated, the court recommends that Defendants' motion to dismiss or transfer be DENIED.[2]

July 21, 2008.

---

**2.** The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule

shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega*, 678 F.2d 376, 378–379 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir.1980). *See also Thomas v. Arn*, 474 U.S. 140, 154–55, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections

within ten (10) days after being served with a copy thereof.